IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BETH ANN McGINNIS,

        **Plaintiff,**

v.                                         **Civil Action No.  1:14CV151**
                                            **(The Honorable Irene M. Keeley)**

CAROLYN W. COLVIN,
**Acting Commissioner of Social**
**Security Administration**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Beth Ann McGinnis ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security

Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of

the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  Procedural History

Plaintiff filed an application for DIB on May 24, 2011, and application for SSI on June 2,

2011, alleging disability beginning December 22, 2008, due to thyroid cancer, depression, and

anxiety (R. 232-36, 237-43, 265).  Plaintiff's applications were denied at the initial and

reconsideration levels (R. 102-05 ).  Plaintiff requested a hearing, which Administrative Law Judge

Mary C. Peltzer ("ALJ") held in Charlottesville, Virginia, on April 30, 2013 (R. 49).  Plaintiff,

represented by counsel, testified on her own behalf (R. 54-80). Also testifying was Vocational Expert Larry Ostrowski ("VE") (R. 80-88). On May 30, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 18-40). Plaintiff filed a timely appeal with the Appeals Council (R. 12-13). On July 8, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. Statement of Facts

Plaintiff was born on January 27, 1976, and was thirty-two (32) years old on her alleged onset date (R. 54). Plaintiff has a high school education and a B.A. in elementary education (R. 55). Plaintiff's past relevant work included bank teller, case manager, group home manager, and part-time hostess (R. 64, 244-260).

Plaintiff's August 8, 2006, lumbar spine MRI showed mild decreased disc space height and a mild bulging annulus fibrosus of L1-L2; decreased disc space height at L2-L3; decreased intervertebral disc space height, osteophytic overgrowth, annulus fibrosus bulging, small ventral epidural impression of disc space level, mild indentation of the ventral aspect of the spinal canal, mild central canal stenosis, small osteophyte and disc herniation complex associated with flattening of the ventral aspect of the thecal sac with minimal narrowing of the spinal canal at L3-L4; mild bilateral faced fluid, normal disc height and signal at L4-L5; and mild bulging, mild narrowing of the ventral aspect of the epidural fat, osteophytic overgrowth, and bulging at L5-S1 (R. 495).

Dr. Chandrasekhar treated Plaintiff for the following: May 4, 2006, dizziness, migraine headache; May 30, 2006, migraine headache, dizziness, low back pain; August 1, 2006, low back pain, migraine headache; August 22, 2006, disc herniation; March 21, 2007, nasal swelling and bleeding; April 18, 2007, urinary tract infection; April 20, 2007, wheezing and poor sleep; August

14, 2007 migraine headaches, asthma, allergies, disc herniation; November 12, 2007, heart palpitations and a lump on the right side of her neck; January 10, 2008, sinus infection, blockage in ears, and fever (R 470-77, 468-69).

Plaintiff's November 11, 2007, chest x-ray was normal (R. 492).

Plaintiff's November 26, 2007, thyroid ultrasound showed three solid nodules on the right (R. 491). Her November 29, 2007, thyroid uptake and scan showed a "cold nodule related to the right lobe which [was] mildly enlarged" and "raise[d] the possibility of a malignancy. The left thyroid lobe [was] normal size and show[ed] uniform activity" (R. 490).

Plaintiff was diagnosed with thyroid cancer on December 12, 2007, and underwent a total thyroidectomy on December 21, 2007 (R. 423-33 434-57, 458-59, 460-67, 503-04).

Dr. Pollock conducted a consultative examination of Plaintiff on January 3, 2008, relative to her diagnosis of stage one (1) thyroid cancer. Plaintiff reported she had undergone gastric bypass surgery in June, 2007, and lost in excess of one-hundred (100) pounds. She then discovered a lump in her neck, which was diagnosed as cancer. She underwent surgery. Her post operation course of treatment had been uneventful; she medicated with Levothyroxine. Plaintiff reported she medicated with Vistaril, Effexor, Levothyroxine, vitamin C, and prenatal vitamins (R. 497, 532). Plaintiff worked as a case manager; she drank socially; she did not smoke; she lived alone. Upon examination, Dr. Pollock noted Plaintiff's vital signs were stable; she weighted two-hundred, fifty-one (251) pounds; her examination was normal. Dr. Pollock described Plaintiff as a "vigorous and otherwise healthy 31 year old woman . . . ." Dr. Pollock recommended Plaintiff cease medicating with Levothyroxine and initiate a low iodine diet (R. 498, 533, 679-81).

Dr. Pollock conducted a I-131 ablation of Plaintiff on February 12, 2008, for elevated levels

of "18.1ng/ml in the absence of antithyroglobulin antibody values." She was treated with 10mg of Compazine. She was instructed to resume her normal iodized diet and Levothyroxine (R. 535, 682).

Dr. Gajendragadkar completed a Physical Residual Functional Capacity Assessment of Plaintiff on March 12, 2008. Dr. Gajendragadkar found Plaintiff could occasionally lift and/or carry up to twenty (20) pounds; frequently lift and/or carry up to ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 507). Dr. Gajendragadkar found Plaintiff could never climb ladders, ropes, and scaffolds. She could occasionally climb ramps and stairs, stoop, balance, kneel, crouch, and crawl (R. 508). Dr. Gajendragadkar found Plaintiff had no manipulative, visual, or communicative limitations (R. 509-10). Dr. Gajendragadkar found Plaintiff could be exposed to extreme heat, wetness, humidity, and noise on an unlimited basis; she should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, and poor ventilation; she should avoid even moderate exposure to hazards (R. 510). Dr. Gajendragadkar found Plaintiff partially credible because the Dr. Mohareb "said she is able to return to work" (R. 511-12).

Jim Capage, Ph.D., completed a Psychiatric Review Technique of Plaintiff on March 14, 2008, and found her positive for depression and anxiety (R. 514-19). Dr. Capage found Plaintiff had mild limitations in her activities of daily living and in her ability to maintain concentration, persistence, and pace. She had no limitations in maintaining social functioning (R. 524).

Plaintiff was examined by Dr. Pollock on August 26, 2008, relative to her thyroidectomy. She denied neck point tenderness, hoarseness, dysphagia, odynophagia, dysarthria, otalgia, lid lag, eyelid ptosis, bradykinesia, muscular fasciculation, or seizures. Dr. Pollock found Plaintiff was in no acute distress; her examination was normal; she was "quite stable" (R. 536, 683).

Plaintiff's TSH level was normal on January 19, 2009, and high on January 26, and February 2, 2009 (R. 633, 635, 637).

Plaintiff's February 10, 2009, whole-body scan for thyroid cancer showed, after "oral ingestion of 4.6 microcuries of I-131, . . . normal activity within the salivary glands, stomach, and urinary bladder. No other foci of abnormal uptake [were] identified that would suggest metastatic neoplasm" (R. 530).

Dr. Pollock conducted a second ablation of Plaintiff on February 17, 2009, due to elevated "17ng/ml in the absence of elevated thyroglobulin levels" and "absence of saturation of the iodine receptor." She was treated with "10mg of oral Compazine." She tolerated the treatment well and was instructed to resume her normal iodized diet and medicate with Levothyroxine (R. 538, 685).

Plaintiff presented to the emergency department of Wetzel County Hospital on March 12, 2009, with complaints of thoracic sprain/strain (R. 619). She participated in physical therapy on March 18, 20, and 24, 2009 (R. 620-22).

Plaintiff presented Wetzel County Hospital's emergency department on June 17, 2009, with complaints of abdominal and low back pain, urination urgency, and nausea (R. 613, 615). Her examinations were normal; she was provided information relative to abdominal pain and ovarian cysts (R. 614-17).

Plaintiff's June 18, 2009, x-ray of her abdomen was normal (R. 612).

Plaintiff's June 19, 2009, transabdominal and transvaginal pelvic ultrasound showed three (3) fibroids and minimally complex cyst on her right ovary (R. 607).

Plaintiff reported to the emergency department of Wheeling Hospital on June 30, 2009, with complaints of abdominal pain. She was medicated with morphine (R. 542). She was assessed with

"3 tumors in uterus. Also[] has chronic pain and out of medication last month . . . ." (R. 547).

Plaintiff presented to Dr. Wade on July 22, 2009, with complaints of back pain. She had received two (2) radioactive iodine treatments for her thyroid condition. Her weight fluctuated. She medicated with Synthroid. Plaintiff's back pain caused headache and nausea. Her depression symptoms "seem[ed] to be under control." She medicated with Tranxene for panic attacks, "abruptly" stopped medicating with it, and the panic attacks returned. Except for a trigger point in her right trapezius muscle, her examination was normal. Dr. Wade diagnosed myofascial pain with trigger points, panic attacks, depression, and asthma. He injected her trigger point and instructed Plaintiff to do low impact aerobic exercises. He prescribed Tranxene (R. 589).

Plaintiff's pelvis ultrasound showed fibroids in her uterus (R. 605).

Dr. Pollock's August 18, 2009, consultative examination of Plaintiff produced normal results. He recommended Plaintiff complete "a hypothyroid set of laboratories as well as I-131 scanning to determine her candidacy for potential re-ablation" (R. 540, 584, 687).

According to Dr. Wade, Plaintiff's myofascial pain and trigger points were "somewhat better" on August 18, 2009. She had "post-injection flare about 3 or 4 days, now settling down." She had no significant radicular symptoms. She was positive for insomnia. She did not "seem to be" depressed. Plaintiff reported she felt "fairly well." She was in no distress; her examinations were normal. Dr. Wade diagnosed insomnia and sinusitis and prescribed Ambien (R. 588).

Plaintiff was examined by Dr. Wade on September 14, 2009. She stated she still experienced myofascial pain. She was "doing well with pain medication." Dr. Wade diagnosed myofascial pain with trigger points, bronchitis, asthma, and depression; he prescribed Effexor, injected a trigger point, increased her dosage of Advair, prescribed a rescue inhaler, and prescribed Avelox (R. 587).

Plaintiff reported to the emergency department of Reynolds Memorial Hospital on September

15, 2009, with complaints of shortness of breath, hemoptysis, and cough (R. 562). Her chest x-ray was normal (R. 564). She was treated with Prednisone and Avelox (R. 563).

Plaintiff's October 7, 2009, pelvic and transvaginal ultrasound showed fibroids (R. 602).

Plaintiff underwent a total abdominal hysterectomy on November 17, 2009 (R. 568-69, 644-46). The post-operative diagnosis was fibroids (R. 580). Her pre-operation examination, conducted by Certified Family Nurse Practitioner ("C-FNP") Provance, produced normal results, except for a rash on her abdomen. Plaintiff reported she had occasional headaches and occasional stress incontinence (R. 571-72).

Dr. Wade completed a Physician's Summary on December 11, 2009, wherein he opined Plaintiff was "[n]ot employable at present. Multiple medical problems limits (sic) patient from working." Dr. Wade listed those medical conditions as thyroid cancer, hypothyroidism, fibromyalgia-like syndrome, asthma, depression, and anxiety (R. 583).

Dr. Wade examined Plaintiff on December 14, 2009. He found "fibromyalgia type symptoms," including "[t]rigger points in both trapezius and mid back" and low back. Plaintiff's asthma was under "fair control." She was "still dealing with depression issues" due to her father's diagnosis of terminal cancer. She weighted two-hundred, eighty-eight (288) pounds. She was in no distress; her examination was normal. Dr. Wade diagnosed asthma, allergic rhinitis, hypothyroidism, and fibromyalgia. He refilled Plaintiff's pain medications and instructed her to return in three (3) weeks for trigger point injections (R. 586).

Plaintiff's TSH levels were normal on December 24, 2009, and elevated on January 7, 2010 (R. 598 , 600).

Dr. Pollock conducted a consultative examination of Plaintiff on January 20, 2010. He found

her thyroglobulin level was elevated and had an undetectable antibody level. Plaintiff's January 15, 2010, I-131 scan was negative for metastic disease. She was positive for hypothyroidism and negative for point tenderness in her neck, hoarseness, dysphagia, odynophagia, dysarthria, otalgia, peripheral adenopathy, or edema. Dr. Pollock's examinations of Plaintiff were normal. Dr. Pollock found Plaintiff had "persistence evidence of disease by virtue of an elevated thyroglobulin level" and recommended a third ablation (R. 689).

Plaintiff completed her third "adjuvant I-131 ablation" on January 26, 2010. Dr. Pollock noted Plaintiff's thyroglobulin level was "persistently elevated." She was instructed to resume her normal iodine diet and continue medicating with Levothyroxine (R. 640, 690, 869).

Plaintiff's January 15, 2010, I-131 whole body scan showed no metastasis (R. 872).

Plaintiff's January 27, 2010, whole body scan showed no metastasis (R. 871).

Plaintiff underwent a spirometry examination on February 26, 2010. The "plateau on the expiratory flows suggest[ed] an obstruction" (R. 692-94).

Barbara L. Rush, Ph.D., conducted a West Virginia Disability Determination Service adult mental status examination of Plaintiff on April 5, 2010. Plaintiff reported she had "multiple health problems" and had "been dealing with depression and anxiety." Plaintiff stated diagnosis and treatment of thyroid cancer, her wedding, her father's death, and having a hysterectomy exacerbated her depression. She had thoughts of suicide, but no plans or intentions. She was tearful, had difficulty sleeping, had memory impairment, and had former episodes of panic. Plaintiff reported she had been admitted to a psychiatric hospital in 2000. She medicated with psychotropic drugs, which "work[ed] for a while and then . . . lost effect." She had never participated in therapy and she had not been treated by a psychiatrist (R. 699). She medicated with Celexa and Tranxene.

Plaintiff reported she had to have her spleen removed in 2001, had a thyroidectomy in 2007, underwent iodine treatments, and had been diagnosed with fibromyalgia (R. 699-700).

Plaintiff drank socially once or twice monthly and only one (1) or two (2) drinks per occasion; however, she had been arrested for driving under the influence the previous year. Plaintiff had an education degree from Fairmont State College. She was last employed in November, 2008, as a case manager at a behavioral health center. She lost that job when the center closed (R. 700).

Upon examination, Dr. Rush found the following: Plaintiff's attitude/behavior was cooperative and pleasant; her eye contact was good; her speech was clear and spontaneous; she was oriented, times three (3); her mood was depressed; her affect was tearful; her psychomotor behavior was absent any agitation; her thought processes were well organized and showed no psychosis; her thought content was focused on her recent weight loss; her insight was good; her judgment was good; she had suicidal thoughts, but no plan or intent; her immediate memory was normal; her recent memory was normal; her remote memory was normal; her concentration was mildly impaired; her persistence was mildly impaired; and her pace was normal (R. 700-01).

Plaintiff's activities of daily living were as follows: on a good day, rose late morning, cared for her pets, washed dishes, did housework, and cooked. She spent "some time" on the computer and shopped with her mother. She prepared dinner for her husband and watched television and played cards. On a bad day, when she has not slept well or is in pain, she "'lay around a lot.'" She retired at 11:00 p.m. Plaintiff paid bills. She read and listened to music. She used to spend time with friends, but no longer felt "like going out very often" (R. 701).

Dr. Rush made the following diagnoses: Axis I - major depression, recurrent and moderate; Axis III - history of thyroid cancer, asthma, and fibromyalgia; Axis IV - moderate psychosocial stress

levels: and Axis V - GAF 50 (R. 701). Dr. Rush found Plaintiff's prognosis was fair and she could manage her own benefits (R. 702).

Dr. Schmitt completed orthopedic and pulmonary evaluations of Plaintiff on April 27, 2010. Plaintiff reported she had an eighteen (18) month "history of fibromyalgia," for which she received injections and for which she had taken cortisone. Plaintiff described her pain as nine (9) our of ten (10) at its worst and four (4) out of ten (10) at its best. Plaintiff had had asthma since the age of eight (8). Her breathing was aggravated by cold weather or walking two (2) blocks or one (1) flight of steps. Plaintiff medicated with Celexa, Levothyroxine, Singulair, Claritin, Advair, Albuterol, Proventil, Lorcet, and Ambien. Dr. Schmitt found Plaintiff was a non-smoker and a non-drinker. Her speech and gait were normal (R. 704). Dr. Schmitt found Plaintiff's vital signs, senses, face, eyes, mouth, throat, neck, chest, back, lungs, cardiac, abdomen, extremities, pulses, neurological, and musculoskeletal system were all normal upon examination (R. 705-06).

Dr. Schmitt noted Plaintiff had a history of injury but no "appreciable muscle atrophy." Her deep tendon reflexes were normal and symmetrical. She had no sensory deficits; she could perform the heel and toe walk. Her peripheral pulses were present and palpable. Her ranges of motion were free and full in all joints. He diagnosed multiple arthralgias, chronic low back syndrome, and fibromyalgia by history (R. 706). As to Plaintiff's pulmonary status, Dr. Schmitt noted Plaintiff had asthma that responded to Proventil. His impression was for childhood asthma with diminished exertional capacity for activities of daily living (R. 706-07).

Dr. Pascasio completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 14, 2010. Dr. Pascasio found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6)

hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 715). Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 716-18). Dr. Pascasio reduced Plaintiff's RFC to medium (R. 719). Dr. Pascasio reviewed Dr. Wade's July 22, and August 18, 2009, office notes; medical records from Plaintiff's September 15, 2009, emergency department visit; medical records relative to Plaintiff's hysterectomy; January 7, 2010, TSH level; February 26, 2010, spirometry examination; and Dr. Schmitt's April 27, 2010, consultative examination, including activities of daily living (R. 721).

Plaintiff presented to the emergency department of Reynolds Memorial Hospital on June 14, 2010, with shortness of breath and coughing (R. 762). Plaintiff's abdominal x-ray was "unremarkable" except for "multiple surgical clips in the left upper abdomen from previous splenectomy" (R. 760). Her chest x-ray was normal (R. 761).

Plaintiff reported to Dr. Wade, on June 16, 2010, that she had been treated at emergency departments for pneumonia and gastritis, which exacerbated trigger point pain. Plaintiff stated the injection provided three to four (3-4) weeks of relief. Plaintiff had insomnia; Ambien was not treating it. Dr. Wade diagnosed myofascial pain with trigger points and insomnia. He injected Plaintiff's trigger points with Lidocane and Depo-Medrol, prescribed Trazodone, and refilled her prescription for Hydrocodone (R. 754).

Plaintiff presented to Dr. Wade on August 10, 2010, with "significant trigger points and trigger point pain in the upper back and trapezius." Plaintiff was fatigued and depressed. Dr. Wade diagnosed myofascial pain with trigger points, "questionable fibromyalgia-like syndrome." He prescribed Savella and continued Plaintiff's prescription for Lortab (R. 753).

Plaintiff reported to Dr. Wade, on October 4, 2010, that she was "[d]oing very well on

Savella." She felt "the best she has felt in years." She had decreased pain; her mood was elevated; she was sleeping better. Her examination was normal. Dr. Wade diagnosed fibromyalgia, asthma, and hypothyroidism and continued Plaintiff's current drug regimen (R. 751).

Dr. Tiu examined Plaintiff for recurrent otitis media on October 8, 2012; he recommended bilateral ventilation tubes be inserted in Plaintiff's ears (R. 897).

Plaintiff presented to the emergency department of Sistersville General Hospital on November 12, 2010, with complaints of sore throat and sores in her mouth. She was treated with Claritin and Toradol (R. 733-34).

A treatment note from Wetzel County Hospital, dated January 11, 2011, read that Plaintiff had pain n her upper neck, back, and shoulders. She had "[i]ncreased trigger points pain in the lower back as well." She requested a Percocet refill. Her mood had improved. She medicated with Savella (R. 1004).

Plaintiff presented to Dr. Wade on January 14, 2011, with complaints of feeling weak, shaky, and sweaty as she ate. Plaintiff's fibromyalgia-type symptoms had increased in her back and neck. Plaintiff reported that "Savella really helped." She had "[c]ut back on pain medication." Plaintiff worked four (4) days per week as a hostess in a restaurant, which increased her fibromyalgia symptoms. Plaintiff reported she had four (4) or five (5) headaches per month, with visual changes and nausea; she had not had them "for quite some time." Except for "[m]ultiple trigger points in her neck, upper back, mid back, and low back, Plaintiff's examination was normal. Dr. Wade diagnosed fibromyalgia and migraine headaches. He prescribed Nubain, Phenergan, Topamax, Savella, Indocin, and Percocet (R. 750).

Plaintiff was treated by Dr. Wade on February 9, 2011, for increased pain, which Percocet

was "helping." Plaintiff's migraine headaches had improved with Topamax; her fibromyalgia pain "seem[ed] to be improving with Savella." Plaintiff "continue[d] to try to waitress a little bit." Plaintiff's mood was elevated. Dr. Wade continued Plaintiff's prescription for Topamax, Indocin, Savella, and Percocet (R. 749).

Plaintiff was treated at EZCARE on February 19, 2011, for congestion (R. 722).

Plaintiff's March 2, 2011, TSH level was low (R. 727).

Dr. Wade treated Plaintiff on March 9, 2011, for fibromyalgia-like symptoms. He prescribed Percocet and Savella. Plaintiff was "stable"; her TSH level was low (R. 748).

Plaintiff presented to Dr. Wade on May 20, 2011, and requested medication refills and that he complete a Department of Health and Human Resource document. Plaintiff stated she had been "doing fairly well" (R. 747).

Plaintiff presented to the emergency department of the Sistersiville General Hospital on May 27, 2011, with complaints of finger pain on her left hand; she had fallen (R. 739-42). The x-ray showed "[s]mall osseous densities . . . adjacent to the volar aspect of the proximal interphalangeal joints of the second and third digits" (R. 743, 755). A splint was put on Plaintiff's fingers (R. 744).

Plaintiff was examined by Dr. Wade on June 8, 2011, for left, third finger pain and injured right ankle (R. 746).

Karl Hursey completed a Psychiatric Review Technique of Plaintiff on July 19, 2011. He found she had no medically determinable impairment (R. 768-81).

Plaintiff's September 28, 2011, lumbar spine x-ray showed "degenerative disc disease . . . with Schmorle's node formation of several endplates" (R. 904, 1011).

Dr. Wade prescribed physical therapy for Plaintiff on October 18, 2011; she participated in

physical therapy on October 27 and 31, 2011, and November 7, 9, 10, and 14, 2011 (R. 906-15).

On December 12, 2011, Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff.  He found she had no medically determinable impairment (R. 786-99).

Dr. Franyutti reviewed the July 18, 2011, Physical Review Technique of Plaintiff and affirmed same (R. 800).

Dr. Papadimitriou treated Plaintiff on December 28, 2011.  She was "known to [him[ from recent Hillcrest" inpatient treatment.  He noted Plaintiff had made a good adjustment and was "'good.'" Her energy and mood had improved. She had lost weight.  Plaintiff reported she had good communication with her sister. Dr. Papadimitriou found Plaintiff was alert and oriented; her affect was broad; she was pleasant and insightful; she was "doing well" (R. 989).

Plaintiff's January 19, 2012, neck CT scan showed "cervical adenopathy with both benign and malignant differential" (R. 867, 1022).  Her chest x-ray was normal (R. 1019).

Dr. Pollock examined Plaintiff on January 20, 2012, and found no "peripheral adenopathy or thyroid bed disease."  Plaintiff had no fevers, chills, night sweats, weight loss, new back or bone pain, shortness of breath, cough, point tenderness in the neck, hoarseness, dysphagia, odynophagia, dysarthria, otalgia, lid lag, eyelid ptosis, bradykinesia, muscle fasciculation, or focal seizure activity. Dr. Pollock noted Plaintiff's January 12, 2012, TSH level was "therapeutic at 0.36."  Upon examination, Dr. Pollock found Plaintiff was in no acute distress.  Except for a "left submandibular neck mass without discrete nodularity," Plaintiff's examination was normal.  Dr. Pollock opined Plaintiff was "a vigorous and otherwise healthy 35 year old woman with a non iodine avid potentially recurrent papillary carcinoma of the thyroid gland."  Dr. Pollock recommended an ultrasound and needle biopsy to obtain a diagnosis (R. 856).

Dr. Rush evaluated Plaintiff on January 25, 2012. Plaintiff had been "hospitalized on Hillcrest in December for an accidental toxicity of her pain medicine." It was not a suicide attempt. Plaintiff reported she had found a lump in her neck. She had attempted to work as a hostess. She had pain due to a "back problem and fibromyalgia." She had been divorced; she had decided to end the marriage. She had a current boyfriend. She lived with him or her mother. She was excited by the birth of her nephew. She was, however, sick "so often that she [felt] like she [was] missing a lot of the child['s] development." Plaintiff stated she had ceased mental health treatment "a couple years ago" because of transportation issues and illnesses (R. 998).

Upon examination, Dr. Rush found Plaintiff's affect was "variable and appropriate." She was tearful. Plaintiff stated she experienced sleep and appetite disturbances, dysphoria, social withdrawal, frustration and self esteem issues. She often felt worthless. Pain made it difficult for her to "plan anything." She missed the "daily contact with coworkers and friends." She tried to keep in touch (R. 998). Plaintiff described her "recent hospitalization [as] a result of foolishly taking an extra pain pill so that she could participate in a family event." Plaintiff's insight and judgment "seemed good." Dr. Rush diagnosed major depression, recurrent (R. 999).

Plaintiff's January 31, 2012, thyroid ultrasound showed "no evidence of suspicious mass or other suspicious soft tissue in the thyroid fossae" and "cervical lymphadenopathy . . . of the soft tissue of the neck" (R. 865, 866).

Dr. Tiu, at the request of Dr. Pollock, completed a consultative examination of Plaintiff on February 21, 2012. He noted that her thyroglobulin levels were persistently elevated and she had undergone three (3) radioactive iodine ablations therefor. A CT scan showed "significant lymphadenopathy of the left level 2 neck[] and smaller scattered bilateral lymphadenopathy 1 cm or

less."  A needle biopsy of the mass did not "reveal evidence of thyroid malignancy" and a flow cytometry was negative for lymphoma. After the biopsy, the swelling subsided.  She had no night sweats; she denied unintentional weight loss (R. 813).  Upon examination, Dr. Tiu found Plaintiff was in no distress.  Her neurologic, heart, lung, abdomen, and extremity examinations were normal (R. 813-14).  She had an enlarged lymph node, bilaterally.  Dr. Tiu diagnosed reactive left cervical lymphadenopathy, which was "[l]ikely reactive, as there has been resolution" (R. 814).

Plaintiff presented to the emergency department of Wetzel County Hospital on March 25, 2012, with complaints of migraine headache.  She was treated with Demerol (R. 927-35).

Dr. Papadimitriou completed a Mental Impairment Questionnaire of Plaintiff on April 16, 2012.  The record was submitted by Plaintiff's counsel.  Dr. Papadimitriou noted he had treated Plaintiff for three days as an inpatient and twice as an outpatient.  Dr. Papadimitriou diagnosed major depressive disorder, moderate.  Dr. Papadimitriou found Plaintiff had the following symptoms: poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, feelings of guilt and worthlessness, difficulty thinking or concentrating, suicidal ideations or attempts, social withdrawal, blunt or flat affect, decreased energy, generalized persistent anxiety, somatization, and hostility and irritability (R. 802).  Dr. Papadimitriou noted the following clinical findings to support his diagnosis: Plaintiff was markedly impaired as of December 11, 2011, when she overdosed; her depression then improved; she still had physical impairments. Dr. Papadimitriou found Plaintiff was not a malinger and her impairments were reasonably consistent with the symptoms and functional limitations he noted.  Plaintiff had a "fair to good response" to treatment and her prognosis was fair to good.  Dr. Papadimitriou noted Plaintiff medicated with Savella, Trazodone, and Buspirone.  She was drowsy due to medications.  Dr.

Papadimitriou found Plaintiff's impairments had lasted or would last for twelve (12) months. Dr. Papadimitriou found Plaintiff's psychiatric conditions exacerbated her pain and physical symptoms, making them "marked - severe" (R. 803). Dr. Papadimitriou found Plaintiff would be absent more than three (3) times per month due to her impairments (R. 804).

In the Mental Abilities and Aptitude Needed to do Unskilled Work category, Dr. Papadimitriou found Plaintiff's ability to perform the following work was good-to-fair: remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two (2) hour segments, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a routine work setting. Plaintiff's ability to perform the following work was good: make simple work-related decisions and be aware of normal hazards and make appropriate precautions. Plaintiff's ability to perform the following work was fair: sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, ask simple questions or request assistance, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress. Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods was fair-to-poor or none. Plaintiff's ability to maintain regular attendance and be punctual within customary, usually strict, tolerances was poor or none. Dr. Papadimitriou based these findings on his "opinion of her globally" (R. 804-05). In the Mental Abilities and Aptitudes Needed to do Semiskilled or Skilled Work, Dr. Papadimitriou found Plaintiff had a fair ability to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently

17

of others, and deal with stress of semiskilled and skilled work. Dr. Papadimitriou based these findings on Plaintiff's problems with mood, pain, balance, stress and pace. In the Mental Abilities and Aptitudes Needed to do Particular Types of Jobs category, Dr. Papadimitriou found Plaintiff's ability was good as to the following work: interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places. Her ability to use public transportation was good-to-fair (R. 805).

Dr. Papadimitriou found Plaintiff had moderate-to-marked-to-extreme limitations in her activities of daily living; moderate limitations in social functioning; frequent limitations in concentration, persistence, and pace; and repeated episodes of decompensation (R. 806).

A medical record from Wetzel County Hospital, dated April 16, 2012, read that Plaintiff presented for a disability physical and to have a form, provided by her lawyer, completed. She was diagnosed with fibromyalgia like syndrome, urinary stress incontinence, and depression (R. 1005).

On April 16, 2012, Dr. Wade completed a Fibromyalgia Residual Functional Capacity Questionnaire of Plaintiff. He found Plaintiff met the American Rheumatological criteria for a diagnosis of fibromyalgia. Dr. Wade found Plaintiff's impairment had lasted or would last for twelve (12) months. Dr. Wade listed the following clinical findings to support his diagnosis: multiple trigger points, fatigue, sleep disturbance, repressed mood, migraine headaches, and irritable bowel symptoms. Dr. Wade listed the following as Plaintiff's symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowl syndrome, frequent and severe headaches, anxiety, panic attacks, depression, and hypothyroidism. Dr. Wade found Plaintiff was not a malingerer and that emotional factors impacted Plaintiff's symptoms and limitations (R. 808). Dr. Wade identified pain location as follows:

18

bilaterally in her lumbosacral spine, cervical spine, thoracic spine, shoulder, arms, and hips. Plaintiff's pain was precipitated by changing weather, fatigue, movement, stress, and cold. Dr. Wade found Plaintiff's impairments were consistent with her symptoms. Dr. Wade found Plaintiff's pain "seldom" interfered with her concentration and attention. He found Plaintiff was capable of low stress work (R. 809). The medication she took caused "possible dizziness." Dr. Wade found Plaintiff could walk four (4) city blocks before she needed to rest; she could sit for ten (10) minutes before she needed to stand; stand for five (5) minutes before she needed to sit down or walk; Plaintiff could sit, stand, and walk for a total of less than (2) hours in an eight (8) hour workday; she needed to walk often for fifteen (15) minutes for as long as five (5) minutes in the course of a workday; she needed to shift at will; she needed no assistive device; she needed to frequently take one-to-two (1-2) hour breaks in the course of a workday; she needed to lie down during her frequent breaks (R. 810). Dr. Wade found Plaintiff could frequently lift less than ten (10) pounds, occasionally lift ten (10) pounds, rarely lift twenty (20) pounds, and never lift (50) pounds. Plaintiff could occasionally twist; she cold rarely stoop, crouch, climb ladders, or climb stairs. Dr. Wade found Plaintiff could use her hands, bilaterally, to grasp, turn, and twist objects twenty (20) percent of a workday; perform fine manipulation fifty (50) percent of the workday; and reach five (5) percent of the workday. Dr. Wade Plaintiff would be absent more than four (4) days per month due to her impairments (R. 811).

Plaintiff presented t Dr. Papadimitriou on April 14, 2012, for medication evaluation. Plaintiff reported she had been "active [with] nephew," cared for her home, and planned on driving again. She denied sustained depression symptoms and had no suicidal or homicidal ideations or death wishes. Her medications were "helping." Dr. Papadimitriou found Plaintiff's depression was in remission. He noted she had missed her last appointment because she had lost her insurance. She

was oriented and alert, her affect was broad, she had minor depression and no psychosis (R. 988).

Plaintiff reported to a medical professional at Women's Health Specialists, Inc., on April 30, 2012, that she had experienced urinary incontinence since she had her hysterectomy. Plaintiff's activity and energy levels were normal. She had no appetite or weight changes. Plaintiff had no fatigue, general feeling of being ill, malaise, chills, fever, or diaphoresis. Plaintiff had no abnormalities in her mood, affect, behavior, coping skills, or sleep patterns. She had no suicidal ideations (R. 839). Plaintiff medicated with Effexor, Vistaril, Tranxene, Levothyroxine, Singular, Claritin, Vicodin, Advair, Albuterol inhaler, Veramyst nasal spray, Keflex, and Diflucan. Upon examination, Plaintiff's vital signs, abdomen, gait, station, orientation, and bladder were normal (R. 839-40). Plaintiff was diagnosed with stress incontinence and referred to Dr. Singh (R. 841).

Plaintiff participated in therapy with Dr. Rush on May 4, 2012. She had not undergone therapy for several months due to "insurance issues and . . . illness." She had developed a daily schedule and had realized "substantial improvement in her mood and outlook." She had been "working on increasing socialization," which she did "at least twice a week." She paced herself due to chronic pain (R. 997).

Plaintiff was evaluated by Dr. Singh on May 16, 2012, for urinary incontinence (R. 877). Upon examination, Dr. Singh found Plaintiff was in no distress. Her skin, neck, mouth, throat, cardiovascular, gastrointestinal, musculoskeletal, and neurological examinations were normal. Dr. Singh diagnosed urinary frequency, acute. He discussed urodynamics and cystoscopic evaluations with Plaintiff. Dr. Singh instructed Plaintiff to resume normal activity (R. 879).

Dr. Rush completed a psychiatric evaluation of Plaintiff on May 25, 2012. She had felt "really down . . . due to pain and depression." Plaintiff "agreed to start treating herself as well as she

[did] other people" (R. 996).

Plaintiff was examined by a medical professional at Women's Health Specialists, Inc., on June 11, 2012. She reported stress incontinence. Plaintiff's vital signs were normal. Her ears, nose, mouth, throat, cardiac system, respiratory, gastrointestinal, musculoskeletal, skin, chest, neurologic, gait, station, psychiatric, endocrine, and lymphatic examinations were normal (R. 842, 845). Plaintiff medicated with Effexor, Vistaril, Tranxene, Levothyroxine, Singular, Claritin, Vicodin, Advair, Albuterol inhaler, Veramyst nasal spray, Keflex, Estradiol, Trazodone, Savella, Oxycodone, Topamax, and Diflucan. Plaintiff reported she did not have "any problems with pain" (R. 843-845).

Plaintiff participated in mental health therapy with Dr. Rush on June 22, 2012. She continued to "work on" her daily routine, schedule, and eliminating her "negative self-talk." She had not been feeling well, physically (R. 995).

Plaintiff presented to Dr. Papadimitriou on June 26, 2012, for a medication "check." Plaintiff stated she was doing "well in all areas." She engaged in "better self talk/energy/expr. of emotion." She was tolerating her medications well. She had lost fifteen (15) pounds. Even though she was applying for Social Security benefits, Plaintiff was "pushing self to do chores/learn/cooking, nail art." She was active with her best friend's children. Dr. Papadimitriou found Plaintiff was calm, alert, oriented. She had no suicidal or homicidal ideations or hallucinations. Her affect was broad. She was pleasant. Dr. Papadimitriou found Plaintiff was "doing well" (R. 988).

A Wetzel County Hospital note, dated July 5, 2012, read that Plaintiff had experienced a "pop in back." She had low back pain (R. 1006).

Plaintiff presented to the emergency department at Wetzel County Hospital on July 28, 2012, with complaints of migraine headache. Her head CT scan was normal. She was treated with Toradol

(R. 836, 939-52).

In a July 31, 2012, letter to Dr. Wade, Dr. Pollock noted Plaintiff's February 8, 2012, needle biopsy had "completely resolved" the left neck adenopathy (R. 857, 861). Dr. Pollock found Plaintiff was in no acute distress; she had gained two (2) pounds since her last visit and weighed two-hundred, sixty-two (262) pounds. Her examination was normal and she was stable (R. 857).

Dr. Singh performed a cystometrogram on Plaintiff on August 10, 2012 (R. 881-82, 889-95).

Plaintiff reported to a medical professional at Wetzel County Hospital that she had "humming in head c/o vertigo" and "trouble concentrating on Augmentin" (R. 1007).

Plaintiff presented to Dr. Papadimitriou on September 18, 2012, for a medication "check." She reported she had health problems and had had a "rough summer." Plaintiff's dosage of Percocet had been increased; she "sometimes" doubled her dosage and then completed the prescription early. She reported "lack of drive." Plaintiff agreed to return to mental health therapy with Dr. Rush; she was going to have her lawyer "refile" her Social Security application. Plaintiff reported agoraphobia, panic attacks, "decline in mood," crying episodes, death wishes, and hopelessness. Dr. Papadimitriou found Plaintiff was well groomed, had reduced eye contact, and was alert and oriented. Dr. Papadimitriou found Plaintiff had "relapsed somewhat." Dr. Papadimitriou increased Plaintiff's dosage of Buproprion (R. 987).

Plaintiff participated in therapy with Dr. Rush on September 18, 2012. She reported she had had mastioditis, back injury, pelvis injury, and "bad reactions to various medications that she was prescribed." She felt discouraged; she was tearful. Plaintiff admitted she had taken more pain medication that was prescribed. Plaintiff made a daily effort to "get up and dressed and do at least 1 productive activity." Her relationships with her mother and boyfriend were stable (R. 994).

Plaintiff reported to a medical professional at Wetzel County Hospital on September 21, 2012, that her pain level was "'7.'" She needed a checkup for fibromyalgia, arthritis, and degenerative joint disease (R. 1008).

Plaintiff's September 25, 2012, cystometrogram of Plaintiff showed incontinence (R. 884).

Plaintiff participated in therapy with Dr. Rush on October 9, 2012. She stated that her overuse of pain medications had been addressed by both her physicians. She "felt a lot better and also more in control of her mood and pain level." Plaintiff had been "more productive around the house and [was] once again enjoying some leisure activities." Plaintiff pledged that she would "continue to work on being more productive, monitoring her negative thinking and her catastrophizing, which[,] she believe[d], contributed to the episode of exacerbation . . . ." Plaintiff was "proud that she was able to catch this quickly and it did not become a significant decompensation" (R. 993).

Plaintiff was examined by a medical professional at Women's Health Specialists, Inc., on October 22, 2012, relative to surgery for a "dropped bladder." Plaintiff had no fatigue, general feeling of being ill, malaise, chills, fever, or diaphoresis. Plaintiff had no abnormalities in her mood, affect, behavior, coping skills, or sleep patterns. She had no suicidal ideations. It was also noted she had no "frequency, urgency, incontinence, hematuria or dysuria, change in urine stream, appearance, frequency or volume" (R. 848). Plaintiff medicated with Levothyroxine, Singulair, Claritin, Vicodin, Advair, Albuterol, Estradiol, Savella, Oxycodone, Trazodone, Topamax, and Wellbutrin (R. 848-49). Plaintiff had no "problems with pain" (R. 849).

Plaintiff presented to Women's Health Specialists, Inc., for problem counseling on November 29, 2012. She had no change in her appetite or weight  Plaintiff had no increase in nervousness,

mood changes, or depression. She was "coping well." Plaintiff medicated with Levothyroxine, Singulair, Claritin, Vicodin, Advair, Albuterol inhaler, Estradiol, Savella, Trazodone, Topamax, Lyrica, and Wellbutrin (R. 850). Plaintiff had no "problems with pain" and her assessment was normal (R. 851).

Dr. Papadimitriou completed a "medic check" on Plaintiff on November 29, 2012. He noted Plaintiff medicated with Lyrica. She experienced a slight reduction in pain and elevated mood. Her insight and motivation were good. Her self worth was "better." She "set[] effective limits" with her sister and other "negative people." She was "active" with her boyfriend when her pain level was low. Dr. Papadimitriou found Plaintiff was oriented and alert. She was calm. Her affect was broad. She was well groomed. Dr. Papadimitriou found Plaintiff was in "remission overall" (R. 986).

Plaintiff participated in individual psychotherapy on November 30, 2012, with Dr. Rush. Plaintiff requested that she be "return[ed] to treatment [after] having been terminated due to poor attendance." She agreed to be more compliant. He health interfered with her "ability to be consistent." Plaintiff was "delighted with the results of the new medication." She had started taking Lyrica and had noticed "some significant improvement in her pain level." She had no side effects. She planned on reducing the dosages of other pain medications. She was not overusing medications as she had in the past. Plaintiff was "more comfortable" and was "carefully adding activities." Plaintiff's affect was bright and animated (R. 992).

Plaintiff participated in individual psychotherapy with Dr. Rush on January 4, 2013. Plaintiff reported she continued to "work on . . . behavioral interventions," such as "pacing herself." She "enjoy[ed] some improvement in the level of pain . . . ." The holidays "went well" but she was "exhausted" because she "over extended" herself. She "utilize[d] some positive thinking strategies"

to enable her to sustain her mood and outlook. Things were "going well" with her boyfriend; they "adopted some healthier eating and exercise routines." Plaintiff discussed her "strong reaction" to a "local rape case" and "how this incident triggered some thoughts that she had about a rape that she endured when she was in college." Plaintiff "agreed that she [did] not need to give up her upbeat attitude about people . . ." (R. 991).

Dr. Pollock examined Plaintiff on January 15, 2013. He found she had no point tenderness in her neck, hoarseness, dysphagia, odynophagia, dysarthria, or otalgia. She weighed two-hundred, seventy-four (274) pounds. Her examination was normal (R. 859). Dr. Pollock found Plaintiff was positive for "a persistent well differentiated papillary carcinoma of the right thyroid lobe status post total thyroidectomy and . . . radiopharmaceutical administration." Dr. Pollock ordered an antibody and thyroglobulin test and a bilateral neck and thyroid bed ultrasound (R. 860).

Plaintiff's thyroglobulin and antibody were undetectable and her thyroglobulin was elevated on January 15, 2013 (R. 968).

Plaintiff's January 18, 2013, thyroid ultrasound showed "no thyroid tissue seen or mass within the thyroid bed" and "borderline enlarged cervical lymph nodes bilaterally along the jugular chains bilaterally" (R. 863).

Dr. Singh evaluated Plaintiff on January 30, 2013, for stress incontinence (R. 886). Upon examination, Dr. Singh found Plaintiff had no back pain; she was in no acute distress; her skin, neck, mouth, throat, cardiovascular, gastrointestinal, and neurological examinations were normal. Dr. Singh diagnosed urinary frequency, acute. Dr. Singh discussed a copatie injection with Plaintiff. He instructed Plaintiff to resume her normal activities (R. 888).

Dr. Pollock examined Plaintiff on January 30, 2013, and found no "obvious palpable

adenopathy." Her examination was normal (R. 1033).

Plaintiff reported to Dr. Tiu, on January 30, 2013, that she realized "significant improvement" in her hearing and ear discomfort post bilateral ventilation tube placement. Plaintiff informed Dr. Tiu that she would "be coming back to see [him] for a possible metastatic papillary thyroid carcinoma" (R. 898).

Plaintiff participated in individual psychotherapy with Dr. Rush on February 1, 2013. Plaintiff informed Dr. Rush that her cancer had returned. She was optimistic because the cancer had "been caught very early." Plaintiff discussed her plans to "go away to Florida" for vacation, which she thought would be "restorative and healthy." Plaintiff expressed "disappointment" at her boyfriend's reaction that she had cancer. She hoped he would be supportive (R. 990).

Plaintiff discussed "Lyrica" with a medical professional at Wetzel County Hospital for treatment of fibromyalgia (R. 1010).

On February 22, 2013, Plaintiff presented to Dr. Tiu for evaluation of metastatic thyroid carcinoma. Dr. Tiu noted Plaintiff had had a needle aspiration of a hypermetabolic lymph node, which showed no malignancy. Plaintiff was asymptomatic and unable to palpate any neck masses. Dr. Tiu noted Plaintiff medicated with Amerge, Claritin, Estradiol, Levothyroxine, Percocet, Phenergan, Savella, Singulair, Topamax, Trazodone, and Wellbutrin (R. 899). Upon examination, Dr. Tiu noted Plaintiff's neurologic system, head, eyes, ears, nose, larynx, neck, lymphatic system, heart, lungs, abdomen, and extremities were normal. Dr. Tiu compared Plaintiff's "recent[]" CT/PET scan to the one she had made one (1) year earlier and observed 1) "conglomerate of 2 lymph nodes in" the submandibular region; 2) "a hypermetabolic lymph node"; and 3) a "slightly suspicious nodularity within the inferior right thyroid bed with hypermetabolic activity." His impression was

for "secondary malignancy lymph nodes." He discussed Plaintiff's "persistent thyroid tissue" condition, which caused "increased thyroglobulin levels," with her and "question[ed] . . . whether the hypermetabolic activity within the right cervical lymph node harbor metastatic papillary thyroid carcinoma" (R. 900).

Dr. Tiu completed a consultative examination of Plaintiff on March 26, 2013, relative to surgery for metastatic thyroid carcinoma. Dr. Tiu noted that both the needle aspiration and core biopsy showed no malignancy or lymphoma. Plaintiff's examination was normal. Dr. Tiu reiterated his February 22, 2013, findings and diagnosis. Plaintiff consented to neck surgery (R. 965-66).

Plaintiff presented to the emergency department at Wetzel County Hospital on March 14, 2013, with a laceration of a finger on her right hand (R. 953-62).

Plaintiff's counsel submitted a Mental Impairment Questionnaire completed by Dr. Papadimitriou on April 11, 2013 (R. 972-73). Dr. Papadimitriou noted he had first treated Plaintiff on December 11, 2011, and treated her every three-to-four (3-4) months thereafter. Dr. Papadimitriou diagnosed major depressive disorder, moderate. Her GAF was forty-two (42). Dr. Papadimitriou listed the following symptoms: appetite disturbances with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia, phychomotor agitation, feelings of guilt or worthlessness, difficulty concentrating, social withdrawal, decreased energy, and generalized persistent anxiety (R. 973). Dr. Papadimitriou noted the following clinical findings, which included results of mental status examinations and which demonstrated the severity of Plaintiff's symptoms: cannot function, "overwhelmed ego," cannot cope, depressed mood, sobbing, and "hopeless." Dr. Papadimitriou opined Plaintiff was not a malingerer and her impairments were consistent with her symptoms and limitations. Dr. Papadimitriou wrote Plaintiff's treatment and response were "limited

response - constant medical issues~psychologic decompensations." Dr. Papadimitriou listed the following as Plaintiff's medications: Buproprion, Trazodone, Abilify, "and 10 others." Plaintiff had no side effects to her medications. Her prognosis was "poor." Dr. Papadimitriou found Plaintiff's impairment had lasted or would last for at least twelve (12) months and her psychiatric condition exacerbated her pain and other physical symptoms (R. 974). Dr. Papadimitriou opined Plaintiff would be absent from work more than three (3) times per month (R. 975).

In the Mental Abilities and Aptitude Needed to do Unskilled Work category, Dr. Papadimitriou found Plaintiff's abilities and aptitudes to understand, remember, and carry out very short and simple instructions; ability to accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions were fair. Her ability and aptitude to ask simple questions or request assistance was good. Her abilities and aptitudes were "poor or none" in the following areas: remember work like procedures, maintain attention for two (2) hour segments, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in routine work setting, and deal with normal work stress (R. 975-76). Dr. Papadimitriou found Plaintiff had poor or no abilities or aptitudes to do any work in the semiskilled and skilled category. Dr. Papadimitriou found Plaintiff's mental abilities and aptitudes to perform particular types of job, specifically, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to

basic standards of neatness and cleanliness were fair; she had no or poor abilities or aptitudes to travel in unfamiliar places or use public transportation (R. 976).

Dr. Papadimitriou found Plaintiff had marked limitations in her restrictions of activities of daily living and ability to maintain social functioning. She had constant limitations in concentration, persistence, and pace. She had repeated episodes of decompensation. Dr. Papadimitriou opined Plaintiff "certainly need[ed]/ qualifie[d] for SSD" (R. 977).

Plaintiff's counsel submitted a Mental Impairment Questionnaire completed by Dr. Rush on April 15, 2013 (R. 979). Dr. Rush noted she had treated Plaintiff on a monthly basis and had last treated her the date of the report. Dr. Rush diagnosed Plaintiff with major depressive disorder, recurrent and moderate. Dr. Rush listed poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, psychomotor agitation, feelings of guilt and worthlessness, difficulty concentrating, social withdrawal, decreased energy, and generalized persistent anxiety as Plaintiff's symptoms (R. 980). Dr. Rush listed the following clinical findings, including mental status examination results, that demonstrated the level of Plaintiff's impairment: sad, tearful, distressed, impeded functioning, fear of future, anxiety, episodes of decompensation, and multiple health issues. Dr. Rush found Plaintiff was not a malingerer and her impairments were consistent with her symptoms. Dr. Rush found Plaintiff had a "modest response" to outpatient psychotherapy, many healthy complications, and cancer recurrence as "treatment and response." Dr. Rush noted Plaintiff medicated with Trazodone, Abilify, and Buproprion and was "groggy at times" due to her medication. Plaintiff's prognosis was guarded. Her symptoms lasted or they could last for at least twelve (12) months. Plaintiff's psychiatric condition exacerbated her pain and other physical symptoms; her "recent recurrence of [cancer elevated]

symptoms considerably" (R. 981).

Dr. Rush found Plaintiff's abilities and aptitudes to do unskilled work were good in the following categories: remember work-like procedures, understand, remember, and carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions. Dr. Rush found Plaintiff had fair ability and aptitude to maintain attention for two (2) hour segments and respond appropriately to changes in a routine work setting. She had poor or no ability or aptitude to maintain attendance and be punctual, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress (R. 982-83). Dr. Rush's medical and clinical findings that were cited to support the above were, "[a]nxiety & pain interfere with [Plaintiff's] ability to be constant and reliable, deal with everyday stress." In the Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work, Dr. Rush found Plaintiff could, on a "fair" basis, understand, carry out, and remember detailed instructions and set realistic goals or make plans independently of others. She had no or poor ability or aptitude to deal with stress of semiskilled and skilled work. Dr. Rush based these findings on "anxiety, pain impact . . . & performance." Dr. Rush found Plaintiff had good ability and aptitude to adhere to basic standards of neatness; fair ability and aptitude to maintain socially appropriate behavior; and poor or no ability or aptitude to interact appropriately with the general public, travel in unfamiliar places,

30

and use public transportation (R. 983).

Dr. Rush found Plaintiff had marked limitations her activities of daily living; marked difficulties maintaining social functioning; frequent deficiencies of concentration, persistence, and pace; and repeated episodes of decompensation (R. 984).

Dr. Pollock conducted a consultative examination of Plaintiff on April 16, 2013. He found she was in no acute distress; her vital signs were stable. Plaintiff denied point tenderness in her neck, hoarseness, dysphagia, odynophagia, dysarthria, otalgia, lid lag, eyelid ptosis, bradykinesia, muscular fasciculation, or focal seizure activity. Dr. Pollock agreed with Dr. Tiu's "upcoming surgery" for "probable regionally recurrent thyroid cancer involving the right hemineck" (R. 1031).

Administrative Hearing

At the April 30, 2013, administrative hearing, Plaintiff testified she could not work full time because she had "a lot of health issues," including "pain problems with" her back, fibromyalgia, degenerative joint disorder, recurrent cancer, migraine headaches, asthma, early menopause (R. 59).

Plaintiff stated she had surgery scheduled on May 17, 2013, to have lymph nodes removed (R. 60). Plaintiff sated she had been treated with "all the radiation [she was] allowed to have" and that, every several years . . . it's going to get into my lymph nodes and they'll have to go in and take more lymph nodes out" (R. 62). Plaintiff stated she had just started medicating with Lyrica (R. 60). She had medicated with Lyrica the previous year for two (2) months and "could tell a difference" in her symptoms. Prior to the recurrence of her cancer, "Wellburtin was enough." Abilify was added due to crying episodes (R. 61). Medication took "care of" her migraine headaches (R. 62). She had been "doing really well with the asthma" due to medication. Trazodone had "help[ed] her sleep." Plaintiff described it as "wonderful." Plaintiff experienced irritable bowel syndrome due to the

medications she took. She needed to go to the bathroom fifteen (15) times per day for irritable bowel syndrome and urinary incontinence (R. 63-64). She had tremors in her fingers and dropped "things," but this side effect should stop (R. 63). Plaintiff had received tirgger point injections for fibromyalgia. She had been treated at an emergency room for mastoiditis, for a cut to her finger, for "shots," and for taking too many pain medications (R. 64-65). Plaintiff participated in mental health therapy every two (2) weeks due to panic attacks and crying episodes (R. 65).

Plaintiff described her upper back pain as "hot . . . rocks . . . sitting (sic) in [her] muscles." She experienced shooting pain under her ribs and into her arms and neck. She experienced this pain twenty (20) days per month, but less often when she medicated with Lyrica (R. 67). She experienced a "dull hurt" in her low back when her "spine bones [were] cracking against each other as they're moving." Sitting, without moving, "help[ed] relieve that pain," but exacerbated her fibromyalgia symptoms (R. 68).

Plaintiff could sit on a couch for half an hour before she needed to move; she could sit in a chair for twenty (20) minutes (R. 69). Plaintiff could sit for a total of four (4) hours in an eight (8) hour workday (R. 76). Plaintiff could walk around a "big block," which took fifteen-to-twenty (15-20) minutes (R. 69). She could stand for forty-five (45) minutes in an eight (8) hour workday (R. 76). Plaintiff could not lift one (1) gallon of milk because of back pain. Reaching was difficult when her "fibromyalgia's really bad." Crouching and kneeling was difficult due to low back pain (R. 70). Plaintiff had difficulty getting along with others during the three (3) previous months due to mood swings (R. 71). Strangers "scare[d] her" (R. 78). She had difficulty making decisions (R. 71). She became confused easily and had difficulty following instructions (R. 72).

A typical day for Plaintiff was as follows: rose by 10:00 a.m., ate breakfast, watched

television, performed a housework chore, such as making the bed or cleaning the litter box (R. 72). In the evening, she watched television. She and her boyfriend cooked dinner together. She was usually able to dress and shower independently (R. 73). She could grocery shop; she would go to a movie theater "[o]nce in awhile." She used a computer; she connected to Facebook and played computer games (R. 74). She could "go out" two (2) or three (3) times per month (R. 75).

The ALJ asked the VE the following hypothetical question:

> The hypothetical individual can perform all functions of light work except the work should be able to be done in a seated or standing position or a combination thereof. Basically they can sit or stand at will. No more than occasional pushing and pulling with the bilateral upper extremities. Occasional stairs and ramps, no ladders, ropes or scaffolds. Occasional balancing, stooping, kneeling and crouching. There should be no crawling and no reaching overhead. And by overhead I mean above the shoulders with the bilateral upper extremities. And the hypothetical individual should avoid concentrated exposure to extreme cold as well as to humidity and wetness. They should also avoid concentrated exposure to respiratory irritants such as dust and fumes, and workplace hazards such as unprotected and moving machinery. The hypothetical individual's limited to unskilled work and an SVP of 1 or 2, in a low stress, static work environment where changes in tasks are infrequent and explained when they do occur. There should be no more than simple work related decisions. And there should be no work where the pace of productivity is dictated by an external source over which the hypothetical individual has no control such as assembly lines and conveyor belts. There should be no contact with the general public, and occasional contact with coworkers and supervisors. . . . [A]ssume that the hypothetical individual is limited to sedentary exertional level with walking limited to increments of 10 to 15 minutes, with the same non-exertional limitations from [above] (R. 82-85).

The VE testified that such a hypothetical person could perform the work of surveillance system monitor, document preparer, ampule sealer (R. 85).

### III. Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

33

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

## IV.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.   The claimant has not engaged in substantial gainful activity since December 22, 2008, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.   The claimant has the following severe impairments: history of fibromyalgia; degenerative disc disease, lumbar spine; obesity; mental disorder variously diagnosed to include major depression, major depressive disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: walking limited to increments of 10 to 15 minutes, occasional pushing an pulling with the bilateral upper extremities; occasional stairs and ramps; no ladders, ropes or scaffolds; occasional balancing, stooping, kneeling and crouching; no crawling or reaching overhead (with the bilateral upper extremities); avoid concentrated exposure to extreme cold, humidity, wetness, respiratory irritants such as dust and frumes (sic), and workplace hazards such as unprotected heights and moving machinery. She can: perform unskilled work at an SVP 1 or 2 in a low stress, static work environment where changes in tasks are infrequent and explained when they do occur; perform no more than simple, work-related decisions; complete no work where pace of productivity is dictated by an external source over which she has no control, such as assembly lines and conveyor belts; and stay on task at least 90 percent of the workday, exclusive of normally prescribed breaks. She can have no contact with the general public and occasional contact with coworkers and supervisors.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on January 27, 1976, and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

35

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using a Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 22, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.       The Plaintiff respectfully submits that the ALJ erred when assigning "no weight" or "little weight" to Plaintiff's treating physicians' medical opinions (Pl.'s Br. at 11–14).

2.       The Plaintiff also respectfully submits that the ALJ erred when failing to find Plaintiff's urinary incontinence to be a severe impairment (Pl.'s Br. at 15).

The Commissioner contends:

1.       Substantial evidence supports the ALJ's decision to assign little to no weight to Plaintiff's treating physicians' medical opinions (Def.'s Br. at 10–12).

2.       Substantial evidence supports the ALJ's decision to not classify Plaintiff's urinary incontinence a severe impairment (Def.'s Br. at 12–13).

## C.  Substantial Evidence Supports the ALJ's Decision to Give the Treating Physicians' Medical Opinions Little to No Weight

Plaintiff first contends that the ALJ erred when she "rejected all four (4) treating source opinions" by assigning each of them little to no weight (Pl.'s Br. at 11). In particular, Plaintiff is referring to the opinions rendered by Dr. Papadimitriou in April 2012; Dr. Wade in April 2012; Dr. Papadimitriou in April 2013; and Dr. Rush in April 2013 (Pl.'s Br. at 12–14).

Conversely, Defendant argues that substantial evidence supports the ALJ's assessment of these treating source opinions because the opinions are not consistently supported by the record and concluded on issues strictly reserved for the Commissioner (Def.'s Br at 10–12).

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating

source medical opinions:

*How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*.  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more

weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to

great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See

Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great

weight because they "reflect[] an expert judgment based on a continuing observation of the patient's

condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.

1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given
> controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20
> C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the
> > nature and severity of [the] impairment(s) is well supported by
> > medically acceptable clinical and laboratory diagnostic techniques
> > and is not inconsistent with the other substantial evidence in [the]
> > case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence
> or if it is inconsistent with other substantial evidence, it should be accorded
> significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the

determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler,

715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines

v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are

never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2

(July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant

is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical

source that offers an opinion on whether an individual is disabled or unable to work "can never be

entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported

by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant

evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this

"approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

### 1. Dr. Papadimitriou's April 2012 Medical Opinion

The ALJ assigned Dr. Papadimitriou's April 16, 2012, medical opinion "no weight" (R. 36). She cited two primary reasons for this decision: (1) Dr. Papadimitriou had only two opportunities to examine Plaintiff; and (2) Dr. Papadimitriou's opinion was inconsistent with the record (R. 36). Focusing on the second reason, the ALJ reasoned that Plaintiff's depression had improved since treatment began and that, based on the severe symptoms Dr. Papadimitriou described in his opinion, Plaintiff therefore should have had a higher GAF score (R. 36).

Attacking this line of reasoning, Plaintiff first claims that even though Dr. Papadimitriou met with her twice, it still is not a reasonable basis for rejecting his entire opinion (Pl.'s Br. at 12). In addition, Plaintiff argues that her GAF score should not be used when determining what weight to give to the opinion because such scores are of little value to the ALJ and using them are not proper under the regulations (Pl.'s Br. at 12).

The ALJ, after reviewing Dr. Papadimitriou's opinion, drew the following conclusions:

claimant experiences the following symptoms: poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, generalized persistent anxiety, somatization unexplained by organic disturbance, and hostility and irritability. He reported that the claimant was markedly impaired as of December 11, 2011. He also reported that the claimant had physical impairments. He indicated that the claimant's impairments would cause her to he absent from work for more than three times a month. He also indicated that the claimant's ability to maintain regular attendance and be punctual within customary, usually strict tolerances was poor or nonexistent. He reported that the claimant's

ability to perform at a consistent pace without an unreasonable number and length of rest periods was also poor or nonexistent. He noted that the claimant's restriction of activities of daily living were marked. He also noted that deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner was frequent (R. 36).

Upon review of the record, the undersigned disagrees with the Plaintiff and finds there is substantial evidence to support the ALJ's decision here.

A global assessment of functioning ("GAF") score[1] is a "subjective determination that represents the clinician's judgement of the individual's overall level of function." White v. Comm'r of Soc. Sec., 572 F.3d 272, 276 (6th Cir. 2009) (quoting Edwards v. Barnhart, 383 F.Supp.2d 920, 924 n.1 (E.D. Mich. 2005)). It is "a snapshot of functioning at any given moment." Powell v. Astrue, 927 F.Supp.2d 267, 273 (W.D. N.C. 2013). It is not dispositive nor does it have direct legal correlation to the requirements of the social security regulations. See Oliver v. Comm'r of Soc. Sec., 415 F.App'x 681, 684 (6th Cir. 2011). GAF scores are to be "evaluated similarly to objective medical evidence." Williams v. Comm'r of Soc. Sec., 679 F.Supp.2d 664, 703 (N.D. W. Va. 2010).

Here, the ALJ afforded little weight to Plaintiff's GAF score (R. 35). Plaintiff nonetheless argues that the ALJ factored in the GAF scores too much in her analysis (Pl.'s Br. at 12). If the ALJ only cited to the GAF score then the undersigned would agree with Plaintiff. See Siddiqui v. Colvin, 95 F.Supp.3d 833, 844 (D. Md. 2015) (holding that GAF scores cannot govern ALJ's analysis). However, besides Plaintiff's GAF score, the ALJ also referenced in her analysis the internal inconsistencies with Dr. Papadimitriou's opinion compared to the record (R. 36). Despite

_____

[1]The undersigned would also note that the new Diagnostic and Statistical Manual of Mental Disorders (5th Edition 2013) has removed the GAF scale because of "conceptual lack of clarity" and "questionable psychometrics in routine practice." Id. at 16. However, the ALJ's decision came out in May 30, 2013, which was two months before the DSM-V was released.

listing severe symptoms in his opinion, Dr. Papadimitriou also noted that Plaintiff had a "fair to good" prognosis and that she had exhibited a "fair to good" response to continuing treatment. (R. 803). After viewing the rest of the record, the undersigned agrees that Dr. Papadimitriou's opinion is inconsistent with the evidence and thus not entitled controlling weight.

Because Dr. Papadimitriou's opinion is not controlling, the six regulatory factors must be viewed to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(1–6). The ALJ noted in her analysis that this was only the second opportunity Dr. Papadimitriou had to evaluate Plaintiff (R. 36). Under the regulations, the "longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Here, the ALJ factored into her decision the limited chances Dr. Papadimitriou had with the Plaintiff. With this fact, coupled with the inconsistency in the record, the undersigned finds that substantial evidence exists to not give Dr. Papadimitriou's April 2012 opinion any weight.

### 2. Dr. Wade's April 2012 Medical Opinion

After evaluating Dr. Wade's April 16, 2012, medical opinion, the ALJ assigned it "little weight" for two reasons (R. 37). First, the ALJ noted that the opinion was inconsistent with the record. Id. According to the ALJ, the record indicated that Plaintiff's condition was continually improving as treatment progressed. Id. The second reason the ALJ gave little weight to Dr. Wade's opinion was because fibromyalgia, the condition Plaintiff was examined for, falls outside his area of expertise. Id.

Plaintiff, on the other hand, argues that Dr. Wade's examination findings are not inconsistent with the record (Pl.'s Br. at 12–13). In addition, regarding Dr. Wade's area of

expertise, Plaintiff contends that the ALJ's analysis does not comport with the regulations because Dr. Wade, despite his non-specialization, has treated Plaintiff for a substantial time period and that specialization is just one factor for the ALJ to consider. (Pl.'s Br. at 13–14).

After examining Dr. Wade's opinion, the ALJ concluded that Dr. Wade made the following determinations:

> claimant met the American Rheumatological criteria for fibromyalgia. He indicated that the claimant has multiple trigger points, fatigue, sleep disturbance, irritable bowel symptoms, depressed mood, and migraine headaches. He also indicated that the claimant experiences the following symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, dysmenorrhea, anxiety, panic attacks, depression, and hypothyroidism. He reported that emotional factors contribute to the severity of the claimant's symptoms and functional limitations. He also reported that the claimant could walk four city blocks without rest or severe pain. He stated that the claimant could sit for ten minutes at one time and stand for five minutes at one time. He also stated that the claimant could sit and stand/walk for less than two hours total in an eight-hour working day. He indicated that the claimant must walk every fifteen minutes for five minutes each time. He also indicated that the claimant needs a job which permits shifting positions at will from sitting, standing or walking. He reported that the claimant would need to take unscheduled breaks during an eight-hour working day where she will need to lie down. He opined that the claimant would likely be absent from work for more than four days per month (R. 37).

Upon review of the record, the undersigned disagrees with Plaintiff and finds there is substantial evidence to support the ALJ's opinion here.

The Fourth Circuit has succinctly described fibromyalgia:

> [f]ibromyalgia is a rheumatic disease with . . . symptoms including "significant pain and fatigue," tenderness, stiffness of joints, and disturbed sleep . . . . Doctors diagnose fibromyalgia based on tenderness of at least eleven of eighteen standard trigger points on the body . . . . "People with rheumatoid arthritis and other autoimmune diseases, such as lupus, are particularly likely to develop fibromyalgia." . . . Fibromyalgia "can interfere with a person's ability to carry on daily activities." . . . "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not."

<u>Stup v. UNUM Life Ins. Co.</u>, 390 F.3d 301, 303 (4th Cir. 2004) (internal citations omitted). The Social Security Administration furthermore has added that fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).

Taking into account these descriptions, the undersigned after examining the evidence agrees with the ALJ that Dr. Wade's opinion is inconsistent with the record and thus deserved no controlling weight. As <u>Craig</u> and the regulations state, "if . . . the treating source's opinion is . . . well supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c); <u>Craig</u>, 76 F.3d at 590 (emphasis added). Contrary to Dr. Wade's April 16, 2012, opinion, his treatment notes indicated that Plaintiff's condition was improving following successive treatment. For instance, Dr. Wade's early treatment notes dated June and August 2010 revealed Plaintiff exhibiting many common fibromyalgia symptoms: fatigue, insomnia, joint pain, depression, trigger points in back (R. 753–54). However, Dr. Wade's most recent treatment notes in late 2010 and early 2011 showed remarkable improvement due to the medication in Plaintiff's symptoms: elevated mood, sleeping better, decreased pain, and less migraines (R.749–51). Dr. Wade's April 2012 opinion, which stated Plaintiff could not work due to these fibromyalgia symptoms, even included a "fair prognosis" for Plaintiff (R.808). Accordingly, the undersigned finds that Dr. Wade's April 16, 2012, opinion merited no controlling weight due to this inconsistency with the rest of the record.

Although Dr. Wade's opinion merited no controlling weight, the six factors from the

regulations must be examined to determine what weight, if any, to afford the opinion. See 20 C.F.R. § 404.1527(c)(1–6). The ALJ determined that because Dr. Wade was outside his area of expertise then his opinion was entitled "little weight." See 20 C.F.R. § 404.1527(c)(5). Plaintiff's main arguments with this analysis is that the ALJ did not address other factors and that Dr. Wade has treated Plaintiff for some time and, therefore, knows and is most familiar with her medical history (Pl.'s Br. at 13).

According to the relevant section of the regulations—which Plaintiff specifically cited to in her motion for summary judgment—the Commissioner will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). In Plaintiff's motion, she plainly identified Dr. Wade as a family physician—not a rheumatologist (Pl.'s Br. at 13). Thus, despite Dr. Wade's prior association with Plaintiff, as per the regulations the ALJ was not mandated to afford Dr. Wade's opinion more weight because he is not a specialist of fibromyalgia. See also Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (noting that rheumatologists' opinions entitled more weight because rheumatology is a specialty of fibromyalgia); Gavigan v. Barnhart, 261 F.Supp.2d 334, 341 (D. Md. 2003) (finding the ALJ erred by rejecting the rheumatologist's opinion because he was both the treating physician and a specialist of fibromyalgia). In addition, contrary to Plaintiff's allegation that ALJ should have cited to more than one of the six factors, the ALJ is not required to list out every single factor in her analysis. See e.g., McKenzie v. Colvin, No. 2:14cv52, 2015 WL 3442084, at *24 (N.D. W. Va. May 28, 2015). Accordingly, the undersigned finds that substantial evidence supports the ALJ's analysis on assigning Dr. Wade's opinion little weight.

### 3. Dr. Papadimitriou's April 2013 Medical Opinion

Regarding Dr. Papadimitriou's April 11, 2013, medical opinion, the ALJ assigned it "little weight" for two reasons (R. 38). First, the ALJ noted that the opinion's inconsistency "to the extreme" with the record because the evidence does not show consistent treatment since Plaintiff's onset date. Id. Second, the opinion rendered a conclusion on an issue specifically reserved for the Commissioner. Id.

Plaintiff contends that the ALJ failed to cite evidence demonstrating how Dr. Papadimitriou's opinion was extreme (Pl.'s Br. at 14). Furthermore, Plaintiff also argues that the ALJ's opinion consisted primarily of "boiler plate language" that "appears to be nothing more than 'filler' to offer the appearance that there was legal rationale supporting the decision." Id.

After reviewing Dr. Papadimitriou's opinion, the ALJ pulled the following conclusions:

claimant has the following symptoms: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. He gave the claimant a poor prognosis. He indicated that the claimant's psychiatric condition exacerbated the claimant's experience of pain or other physical symptoms. He reported that the claimant's impairments would cause the claimant to be absent from work for more than three times a month. He stated that the claimant's ability to remember work-like procedures, maintain attention for two-hour segments, maintain regular attendance and be punctual within customary, usually strict, tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, and deal with normal work stress were poor or nonexistent. He opined that the claimant certainly needed/qualified for SSI (R. 37–38).

Upon review of the record, the undersigned disagrees with the Plaintiff and finds there is

substantial evidence to support the ALJ's opinion here.

Dr. Papadimitriou's opinion concluded that Plaintiff qualified for SSI because of her disability (R. 997). Yet, determining whether someone is disabled is an issue reserved only for the Commissioner. See 20 C.F.R. § 404.1527(d)(1). While Plaintiff may object to this "boiler plate language" and "filler" legal analysis, the regulations, case law, and social security policy interpretations are quite clear and straightforward on this matter: a medical source that offers an opinion on whether an individual is disabled cannot be entitled to controlling weight. See SSR 96-5p, 1996 WL 374183, at *5; Morgan v. Barnhart, 142 F.App'x 716, 723 (4th Cir. 2005) (ALJ is not required to assign heightened evidentiary value to such opinions); 20 C.F.R. § 404.1527(d)(1) ("a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled").

Although Dr. Papadimitriou's opinion is not entitled controlling weight, the opinion may not be summarily dismissed on that basis but instead must be evaluated "in light of the entire record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." Morgan, 142 F.App'x. at 723 (quoting SSR 96-5p, 1996 WL 374183, at *3). After examining the record, the undersigned finds that substantial evidence supports the ALJ's analysis. Dr. Papadimitriou's April 2013 opinion noted that Plaintiff exhibited a severe list of symptoms and had a "poor" prognosis. Yet, the doctor's own treatment notes a mere five months prior indicated Plaintiff was in overall remission and had reported better self-worth plus an increased mood outlook (R. 986). Dr. Papadimitriou's other past treatment notes indicated Plaintiff was doing better and again in remission (R. 988–98). Furthermore, the inconsistency with Dr. Papadimitriou's opinion is highlighted by the rest of the record—Dr. Rush's treatment notes also showed an improvement in Plaintiff's psychological well-being as well (R. 990–97). Accordingly, the conclusory statement and the inconsistencies in the record, which the ALJ discussed,

albeit briefly, are sufficient reasons for assigning Dr. Papadimitrou's opinion little weight. Therefore, the undersigned finds that substantial evidence supports the ALJ's analysis here.

### 4. Dr. Rush's April 2013 Medical Opinion

Finally, the ALJ assigned "little weight" to Dr. Rush's April 15, 2013, medical opinion because it was inconsistent with the doctor's previous treatment notes (R. 38). The ALJ also noted that Dr. Rush's opinion mainly consisted of Plaintiff's subjective thoughts instead of objective findings. Id.

The Plaintiff, on the other hand, simply states that "none of the above AGAIN is a logical explanation, let alone one that should be deemed supported by substantial evidence" (Pl.'s Br. at 14).

After examining Dr. Rush's opinion, the ALJ noted the following conclusions:

> claimant experiences the following symptoms: poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interest, psychomotor agitation on or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. She opined that the claimant would likely be absent from work for more than three times a month due to her impairments or treatment; has marked restrictions of her activities of daily living; has marked difficulties in maintaining social functioning; has frequent deficiencies of concentration, persistence or pace; and has repeated episodes of deterioration or decompensation in work or work like settings (R. 38).

Upon review of the record, the undersigned disagrees with the Plaintiff and finds there is substantial evidence to support the ALJ's opinion here.

Per the rule in Craig, if the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight." Craig, 76 F.3d at 590 (emphasis added). The undersigned finds that Dr. Rush used acceptable psychological clinical techniques when evaluating Plaintiff; yet, the undersigned also finds that her opinion *is* inconsistent

with her own treatment notes. For example, the treatment notes show over time that Plaintiff seemingly improving with each session. See Russell v. Barnhart, 58 F.App'x. 25, 29 (4th Cir. 2003) (rejecting the Plaintiff's psychologist's opinion because the treatment notes indicated over time that Plaintiff's mental conditions were improving). Beginning in April 2012, Plaintiff reported to Dr. Rush a "substantial improvement in her mood and outlook"; Dr. Rush also concluded that Plaintiff "was quite receptive and insightful as well as productive in session" (R. 997). Again, in the next session May 2012, Plaintiff, while reporting feeling depressed, recognized how her negative self-statements were impacting her life and that she needed to change that (R. 996). Fast forward to June, Plaintiff reported she had some success trying to change her negative self-talk (R. 995). September 2012, however, was a low point as Plaintiff reported being "catastrophizing" and "discouraged"; yet, only a mere month later, Plaintiff reported being more productive, feeling "a lot better and also more in control of her mood and pain level" and had ceased both the negative self-talk and catastrophizing (R. 993–94). November 2012 again showed improvement in Plaintiff's psyche as Dr. Rush noted she was "bright and animated" (R. 992). Plaintiff herself also noted "significant improvement in her pain level" and reported happiness with new medication. Id. Finally in January and February, Plaintiff again reported optimism and pain improvement levels even despite her recent diagnosis of cancer (R. 990–91).

Contrasting these treatment notes, which showed definite levels of improvement, to Dr. Rush's opinion—made only two months after their last session—stating that Plaintiff has a wide array of negative symptoms making her unable to work, the undersigned finds that the two are inconsistent with each other and therefore Dr. Rush's opinion does not merit controlling weight.

Because Dr. Rush's opinion is not entitled controlling weight, the factors from the

regulations must be examined. See 20 C.F.R. § 404.1527(c)(1–6). However, the ALJ does not have to list and address each factor in his or her opinion. See, e.g., Beland v. Comm'r of Soc. Sec., No. 1:14cv138, 2015 WL 5169112, at *4 (N.D. W. Va. Sept. 1, 2015). In her opinion, the ALJ discussed the inconsistencies of Dr. Rush's opinion with the record, as referenced to above (R. 38).

Accordingly, the undersigned finds that the ALJ provided sufficient reasons for assigning little weight to Dr. Rush's opinion and holds that substantial evidence supports the ALJ's findings.

### D. Plaintiff's Urinary Incontinence is Not a Severe Impairment

Last, Plaintiff contends that the ALJ erred when failing to find her urinary incontinence to be a severe impairment (Pl.'s Br. at 15). Specifically, Plaintiff alleges that the "ALJ's explanations on the issue are nothing mroe (sic) than conclusions without premises to support those conclusions" and that the ALJ applied "too stringent a standard at Step 2" (Pl.'s Br. at 15).

Defendant counters this arguing that Plaintiff's urinary continence "did not significantly limit her ability to perform work-related functions" and therefore cannot be considered a severe impairment under the regulations (Def.'s Br. at 12–13). In support, Defendant alleges that Plaintiff received treatment for only eight months, her most recent treatment indicated normal genitourinary findings, and that she reported being in no distress (Def.'s Br. at 13).

To determine whether a disability exists, the claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. Jan. 9, 2015) (citations omitted).

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521.

An impairment must result from abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509. An impairment, however, can be considered "'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

After reviewing the record, the undersigned agrees with the ALJ and finds that substantial evidence supports the conclusion that Plaintiff's urinary incontinence was not a severe impairment.

Examining the ALJ hearing testimony transcript, Plaintiff stated she makes up to fifteen trips to the bathroom each day and wears a pad at all times due to a combination of her IBS and urinary incontinence (R. 64). Yet, when asked whether her IBS would interfere with work, Plaintiff testified it "*would be fine*" as long as "they [employers] were okay with me getting up and you know, running to the restroom all the time . . . ." (R. 63–64) (emphasis added). While subjective evidence is given less deference than objective medical evidence, the undersigned believes it is important to note that Plaintiff herself thinks that her IBS and incontinence would not be a major hindrance at work as long as she was able to make multiple trips to the bathroom. See Hammond v.

Apfel, 5 F.App'x 101, 104 (4th Cir. 2001) (holding that the Court should not rely on subjective evidence not supported by objective medical evidence).

The objective medical evidence contained in the record, however, lends more support to the ALJ's ruling that Plaintiff's urinary incontinence was not a severe impairment. In May 2012, Dr. Singh, a urologist, evaluated Plaintiff for urinary incontinence and found normal genitourinary system movements and diagnosed Plaintiff with acute urinary frequency (R. 878–79). In June 2012, Plaintiff went to the Women's Health Specialists reporting incontinence; after being evaluated, Plaintiff was found to exhibit all normal bodily functions (R. 842–46). Plaintiff returned to the Women's Health Specialists in October 2012 and this time reported "no frequency, urgency, incontinence, hematuria or dysuria, change in urine stream, appearance, frequency or volume" (R. 848). Plaintiff returned to Dr. Singh in January 2013 and again was diagnosed with acute urinary frequency after Dr. Singh determined Plaintiff exhibited all normal genitourinary functions (R. 888). In addition, Dr. Singh told Plaintiff she could continue all normal activities (R. 888). This was the last reported treatment with Dr. Singh—or any urologist for that matter—which leads credence to the conclusion that Plaintiff's incontinence was not that severe since Plaintiff did not seek out more treatment. See Waller v. Colvin, No. 6:12-cv-00063, 2014 WL 1208048, at *8 (W.D. Va. Mar. 24, 2014) (finding that failure to follow up with treatment supports ALJ's determination that the impairment was not severe).

Taking into account the objective medical evidence, which suggests that Plaintiff suffered from an acute condition with normal genitourinary function, the undersigned finds that Plaintiff's urinary incontinence is not a severe impairment. The undersigned agrees with the ALJ that Plaintiff

has suffered no functional loss and can complete the basic work activities as required under the regulations. See 20 C.F.R. § 404.1521; see also Evans, 734 F.2d at 1014.

Accordingly, the ALJ's analysis is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI and therefore recommend that Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of November, 2015.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE